# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| Carrie GILL, | : |
|  | : |
| Plaintiff, | :  Civil No. 16-9155 (RBK) |
| v. | : |
|  | :  **OPINION** |
| BH MEDIA GROUP, INC. d/b/a THE PRESS | : |
| OF ATLANTIC CITY, | : |
|  | : |
| Defendant. | : |
|  | : |

**KUGLER**, United States District Judge:

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment [Doc. No. 28] dismissing Plaintiff Carrie Gill's Complaint [Doc. No. 1], which brings seven causes of action: retaliation under the Family and Medical Leave Act "FMLA" (Count I); interference with Plaintiff's FMLA rights (Count II); interference with Plaintiff's New Jersey Family Leave Act ("NJFLA") rights (Count III); retaliation under the NFLA (Count IV); disability or perceived disability discrimination under the New Jersey Law Against Discrimination ("LAD") (Count V); associational disability discrimination under the LAD (Count VII). For the reasons discussed in this Opinion, the Court **GRANTS** the Motion for Summary Judgment.

# I.     FACTUAL BACKGROUND

This is a case of alleged retaliation and interference.  Plaintiff Carrie Gill asserts that her former employer, Defendant BH Media Group, Inc., doing business as The Press of Atlantic City ("The Press"), violated her rights under the Family Medical Leave Act, "FMLA," 29 U.S.C. § 2601 *et seq*., and related New Jersey laws, when it allegedly failed to properly apprise her of her rights to leave time regarding both her son's medical condition and her surgery, and then allegedly pretextually eliminated her position while she was on medical leave.  While the Defendant argues corporate consolidation led to the termination of various positions, including Plaintiff's position as Circulation Sales Manager, Plaintiff claims she was targeted because of her and her son's need for medical leave.

## 1.  Background

The Press hired Plaintiff as a full-time Advertising Account Executive in December 2003.  Pl. St. Mat'l Fact ("SMOF") [Doc. No. 31-1] ℙ 7.  In 2013, she became the Circulation Sales Manager in The Press' Circulation Department.  Def's St. of Mat'l Fact ("SMOF") [Doc. No. 28-2], ℙ 10.  In that role, she reported to Director of Circulation John Celestino ("Celestino" or "Director Celestino").  Compl. ℙ 19.  Celestino reported to Publisher Mark Blum ("Blum" or "Publisher Blum"), and the two met weekly to discuss matters relating to circulation.  *Id.* ℙ 23; Celestino Dep'n 109:2.

While not in dispute, the Court briefly notes Plaintiff's prior taking of FMLA leave. From 2007 to 2011, Plaintiff took at least three FMLA leaves of absence.  First, she took leave in late 2007 because of a car accident and returned to work in January 2008.  Pl. SMOF ℙ 11. Second, she took FMLA leave of absence related to the birth of her son in 2009.  *Id.* ℙ 16.

Third, she took leave from November 2011 through March 2012 for the birth of her daughter. *Id.* ¶ 20. In all three instances, she requested, received, and submitted FMLA forms. *Id.* ¶¶ 12–17. In addition, Defendant's H.R. representatives assisted her with FLMA leave. Pl's Reply SMOF [Doc. No 31-2], ¶ 23. Plaintiff returned to the same position following these instances of FMLA leave and does not indicate any instances of retaliation or interference. *Id.* ¶ 18, 20, 21, 22. The instant matter focuses on issues regarding untaken FMLA leave in conjunction with her son Joshua's medical condition in 2015 and her foot surgery in 2016.

### 2. Intermittent Leave Relating to Plaintiff's Son

Sometime in 2013 or 2014, Plaintiff revealed to Director Celestino that Joshua, then four-years-old, suffered from autism spectrum disorder, anxiety, and sleep disturbance. Pl. SMOF ¶ 10. These conditions required occupational therapy, speech therapy, and behavior therapy. *Id.* ¶ 11.

In response to Plaintiff's son's conditions, Celestino permitted her to come in late and leave early on several occasions. *Id.* ¶¶ 29–32. Throughout that time, Plaintiff often texted Celestino when she needed to come in late or stay home for childcare. *Id.* ¶¶ 33–40. From June 2014 through October 2015, Celestino permitted her to work from home as needed, so long as she worked her scheduled number of hours. *Id.* ¶ 47. Celestino testified that he never denied any of Plaintiff's requests to miss work for family reasons. *See* Celestino Dep'n. He also stated that his accommodations and flexibility even led some employees to suggest that Plaintiff was a "favorite" at work. *Id.*

By 2015, Plaintiff requested to work at home on an intermittent basis because of her son's condition. Celestino testified that Publisher Blum denied Plaintiff's request to work at

home on an intermittent basis.  Celestino Dep'n, 166:6–9.  Blum stated that this denial was for

Plaintiff's request to work from home permanently, not intermittently.  Blum Dep'n, 65: 15–9.

While Defendant suggests this arrangement carried on further into 2015, Plaintiff stated that the

situation changed following her son's hospitalization in October 2015.  *See* Pl. Reply SMOF ¶¶

47–8.

 In October 2015, Plaintiff took her son to Children's Hospital of Pennsylvania for

medical treatment.  Pl. SMOF ¶ 24.  Plaintiff arrived late to work and left early to care for her

son during this period.  She stated that she always made up the time she missed for her son's

condition.  Pl. Reply SMOF ¶¶ 49–51.  In response to her increased absence, Celestino testified

that he faced new pressure to account for her schedule.  *See* Celestino Dep'n.  Celestino

allegedly discouraged her from speaking to Publisher Blum about increased periods of leave.

Plaintiff emailed Celestino, "I know you want me to say nothing.  I'm tired of walking on egg

shells."  *Id.*  She then informed him that she would talk to Publisher Blum about her son.  Pl.

Reply SMOF ¶ 23.  She also informed H.R. Director Ed Steiger.  *Id.* ¶¶ 43–44.

 Plaintiff claims Celestino's flexibility came to an end in November 2015, when he

"disciplined [her] for coming in late."  *Id.* ¶ 50.  This alleged discipline came in the form of a

Performance Action Plan ("PAP").  On November 16, 2015, Defendant issued Plaintiff the PAP.

Pl. SMOF ¶ 33.  Celestino testified that he faced increased scrutiny from both subordinates and

superiors in permitting Plaintiff to arrive late and leave early with such flexibility.  Celestino

Dep'n.  As a result, Celestino created the plan after receiving input from H.R. Director Steiger

and Publisher Blum.  *Id.* 169:1–2.  Blum later testified that he was only aware that Plaintiff had a

flexible schedule and did not know the specifics of her son's medical conditions.  *See* Blum

Dep'n 57–60.

The one-page Plan has three sections. Performance Action Plan [Doc. No 31-20]. The first provided bulleted goals for sales and retention. *Id.* The second stated rules about respect and collegiality. *Id.* The third section, just three lines, was entitled "Hours." *Id.* This section stated, "You are required to work a nine-hour shift which includes sales meetings with potential partners, kiosk shipping and one hour for lunch. Your schedule is 8:30AM – 5:30AM Monday through Friday unless I approve differently." *Id.*

The parties dispute the events that occurred in a meeting in Publisher Blum's office on November 17, 2015. While they agree Plaintiff discussed her son's medical condition with Publisher Blum and Director Celestino, they disagree as to whether Plaintiff discussed or requested leave. Pl. Reply SMOF ℙ 44. Plaintiff states that she specifically requested what options she had regarding her son and potential leave. *Id.* She also states that she requested to work from home on an intermittent basis to care for her son. Pl. SMOF ℙ 30. In the meeting, Plaintiff claims that Publisher Blum said,

> [W]e do not make special accommodations at your level. There's no other employees inside this company that we currently have that we accommodate for. You are a manager and you manage other employees . . . you have vacation time and you have sick time.

Pl. Reply SMOF ℙ 44. Plaintiff further claims that she requested a solution when she had to miss work due to her son, and that Publisher Blum, H.R. Director Steiger, and Director Celestino promised to provide a solution, but never delivered one. Pl. SMOF ℙ 48. In her deposition, Plaintiff revealed that Publisher Blum "threw out" the PAP issued from the prior day. Gill Dep'n, 214:6–17.

Defendant insists that Plaintiff never asked for FMLA or NJFLA leave to care for her son. Def. SMOF ℙℙ 51–2. In addition, Defendant argues Plaintiff was permitted to

work from home and miss work so long as she worked her scheduled number of hours. Def. Reply SMOF ℙ 51.  Meanwhile, Plaintiff admits she never used the term "NJFLA" or "FMLA" to request leave for her son, but states that she requested what her options were to care for her son and on many occasions requested to miss time from work for her son's treatment.  Pl. Reply SMOF ℙℙ 52–3.

### 3. Disability Leave Relating to Plaintiff's Foot Surgery

In January 2016, Plaintiff informed Celestino that she needed foot surgery.  Pl. Reply SMOF ℙ 54.  Celestino emailed Publisher Blum to inform him of Plaintiff's surgery.  Def. SMOF ℙ55.  Celestino then spoke with Plaintiff about the possibility of her driving to work following the surgery.  *Id.* ℙ 57.  While Mr. Celestino did not recall Plaintiff ever asking anyone at The Press for a leave of absence for her foot surgery, *Id.* ℙ 65, Plaintiff insists she notified him that she would need at least two weeks off for recovery.  Pl. Reply SMOF ℙ 65.  Plaintiff further states that Mr. Celestino told her, "if she took the [FMLA] medical leave, she would not have a job to come back to."  Compl. ¶ 48.

The parties agree that Mr. Steiger spoke with Plaintiff about FMLA leave regarding her foot surgery.  Pl. Reply SMOF ℙ 58.  He stated that if Plaintiff wanted FMLA leave for the surgery she could take it.  *Id.*  Plaintiff states that Defendant never provided her with any written notice of her rights and responsibilities under the FMLA.  *Id.*  She further states that she "completed every form she was given related to her foot," and there is no evidence any of these forms are FMLA-related.  *Id.*  Again, Defendant states that Plaintiff never mentioned a leave of any kind.  Def. Reply SMOF ℙ 64.  Defendant also points out that the Company handbook, for which Plaintiff acknowledged receipt, provided information regarding FMLA leave.  *Id.*

Plaintiff underwent surgery on her foot on March 2, 2016. Pl. Reply SMOF ¶ 62. Plaintiff claims that Defendant only provided a form regarding temporary disability benefits. She completed the New Jersey State Temporary Disability paperwork the next day. *Id.* ¶ 63. Plaintiff denies the extent that she understood she had completed any FMLA paperwork and was therefore taking protected FMLA leave. *Id.* ¶ 64. Plaintiff further attaches the testimony of Alexandra Reed, a fellow employee who informed Defendant she was having a mastectomy and similarly was not offered FMLA leave. Pl. SMOF ¶ 68. Instead, Reed, like Plaintiff, took disability leave. *Id.*

### 4. Plaintiff's March 4, 2016 Termination

Until her termination, Plaintiff served as a Circulation Sales Manager at The Press. Pl. Reply SMOF ¶ 66. She was responsible for managing a group of customer service representatives in the Circulation Department that handled customer calls from The Press subscribers. *Id.*

The parties dispute the forces that led to Plaintiff's termination. Defendant argues that The Press underwent a corporate consolidation that altered Plaintiff's Circulation Sales Manager position. Def. SMOF ¶ 69. Then, when the company missed its revenue targets, Defendant enacted a Contingency Plan to save $500,000 in costs, which eliminated various positions, including Plaintiff's position. *See* Blum Dep'n.

In 2015, The Press began a corporate consolidation. Def. SMOF ¶ 69. Sometime in the spring of 2015, nearly a year before Plaintiff's termination, Defendant began outsourcing certain customer call service duties to Tulsa, Oklahoma. *Id.* Defendant also installed a new circulation software system that caused some of the Circulation Department work at The Press to become

unnecessary.  Def. SMOF ⁋ 67.  The Press reduced the number of local customer service representatives in the process.  *Id.* ⁋ 68.

At the end of 2015, the Press then put a "Contingency Plan" into effect, where the company would cut expenses contingent upon revenue not holding up to projection.  Celestino Dep'n 103:19–21.  Employees were aware that declining revenues could lead to layoffs.  *See id.* In January 2016, Plaintiff spoke with H.R. Director Steiger who stated that she would not be laid off under the contingency plan.  Pl. SMOF ⁋ 76.  On January 26, 2016, Publisher Blum sent an email to Mr. Celestino that specifically discussed the termination of Plaintiff.  Def. SMOF ⁋ 70. In relevant part, Blum wrote,

> I had a thought last night . . .  could we add another full-time person to our marketing department to work with Mike and then eliminate [Plaintiff's] position . . . I'm not sure this would work but it might and we'd probably save $30,000 annually . . . .  What do you think?

*Id.*  Mr. Celestino responded that morning and agreed with Publisher Blum's general proposal. *Id.* ⁋ 71.  Shortly thereafter, Celestino sent another email to Blum, "I do want to think [the reduction] through some more to make sure we are covered."  *Id.* ⁋ 72.[1]

On January 31, 2016, The Press launched the 2016 contingency plan to save approximately $500,000 for the business.  Def. SMOF ⁋⁋ 73–44.  Publisher Blum stated that he worked with various Department heads in order to determine the positions for reduction.  Blum Dep'n.  The plan called for the elimination of the Circulation Sales Manager, Sales Coordinator, and Retail Telemarketer, and other positions.  *Id.* ⁋ 75. Celestino testified that it was difficult to determine who stayed and who had to go.  *See* Celestino Dep'n.  He is not sure if he put Plaintiff

---

[1] Celestino later testified that he did not wish to include Plaintiff in the reduction in force because "she was a big contributor to the department," and The Press "could probably get savings from [terminating] someone else."  Celestino Dep'n, 178:3–25.

on the reduction in force list, but claims he "could have put everybody that works in the department on that list at some point . . . ." *Id.* 112:17–24. He resigned his position at The Press shortly after the launch. At the time of his departure, Celestino knew Plaintiff's job was in jeopardy. *Id.* The Plan called for Plaintiff's position of Circulation Sales Manager to be replaced with a lower paying circulation coordinator. *Id.* 181:6–15.

On March 7, 2016, Plaintiff received a memorandum that indicated her position had been eliminated and she was not eligible for rehire. Pl. Reply SMOF ¶ 77. She then spoke with Mr. Steiger who explained that Plaintiff was part of a group layoff. *Id.* Plaintiff then texted Celestino, stating, "As [you] know, I got laid off today". *Id.* ¶ 80. Defendant points out that in neither Plaintiff's correspondence with Mr. Steiger nor subsequent texts with Mr. Celestino did she allege her termination was part of any unlawful reason. Def. SMOF ¶ 79. Defendant also states that The Press did not hire anyone to cover Plaintiff's duties following her termination. *Id.* ¶ 82.

Approximately one week after Plaintiff's termination, Defendant posted a job opening for a circulation sales assistant. Pl. SMOF ¶ 83. Plaintiff denies that the position was eliminated and states that she was targeted for the layoff due to her son's disability and her need for protected medical leave. Pl. Reply SMOF ¶ 77. She further states that, while no one assumed her exact title, Defendant hired Samantha Hammond shortly after Plaintiff's termination to absorb her duties in the Circulation Department. *Id.* ¶ 82. Defendant hired Hammond in the Circulation Department on May 1, 2016. Pl. SMOF ¶ 86.

## 5. Procedural History

On December 12, 2016, Plaintiff filed a Complaint [Doc. No. 1] in this Court alleging various causes of action arising from the facts above. She claims Defendant improperly fired her for taking protected leave or requesting protected leave. Comp. ⁋ 1. She claims that Defendant failed to notify her of her rights to take protected leave. *Id.* She further asserts that Plaintiff discriminated against her based on her son's disability or perceived disability. *Id.* ⁋ 2. Defendant also failed to provide accommodations for these needs. *Id.*

Plaintiff brings seven causes of action in the Complaint. Compl. [Doc. No. 1]. She alleges retaliation under the Family and Medical Leave Act "FMLA" (Count I); interference with Plaintiff's FMLA rights (Count II); interference with Plaintiff's New Jersey Family Leave Act ("NJFLA") rights (Count III); retaliation under the NFLA (Count IV); disability or perceived disability discrimination under the New Jersey Law Against Discrimination ("LAD") (Count V); associational disability discrimination under the LAD (Count VII). Compl. [Doc. No. 1].

## II.  LEGAL STANDARD

### 1. Summary Judgment

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to

weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## 2. Family Medical Leave Act ("FMLA")

The FMLA is designed to balance the demands of the workplace with the needs of families in a manner that will minimize gender discrimination and ensure that leave is available for compelling medical and family needs. *See* 29 U.S.C. § 2601(b). The FMLA is meant, in part, "to entitle employees to take reasonable leave for medical reasons." *Id.* § 2601(b)(2). Under Section 2612, an eligible employee may take up to twelve weeks of unpaid leave within a twelve-month period for any of the following reasons: (1) because of the birth of a son or daughter and the need to care for such son or daughter, (2) because of the placement of a son or daughter with the employee through adoption or foster care, or (3) because of the need to care for a spouse, parent, or child with a serious health condition. *Id.* § 2612(a)(1).

To be eligible for FMLA leave, an employee must have been: (1) employed by the employer for at least twelve months, (2) employed for at least 1,250 hours of service during the twelve months leading up to the leave, and (3) employed at a workplace where 50 or more employees are employed within 75 miles of that work site.[2]  *Id.* § 2611(2)(A)-(B); 29 C.F.R. § 825.110(a).  Eligible employees who take and return from FMLA leave are entitled to be restored to an equivalent position of employment with equivalent benefits, pay, and other terms. 29 U.S.C. § 2614(a).

## III.    DISCUSSION

The FMLA creates two distinct claims, *i.e.*, interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.  Family and Medical Leave Act of 1993 § 105, 29 U.S.C. § 2615(a)(1)–(2).  Plaintiff here asserts both claims.

### A.  Plaintiff's Retaliation Claims under the FMLA and NJFLA (Counts I and IV):

Plaintiff argues that Publisher Blum and Director Celestino retaliated against her because she requested FMLA leave regarding both her son's medical condition and her foot surgery. Specifically, Plaintiff focuses on the events surrounding her November 17, 2015 meeting with Blum and Celestino.  There, she "notified the most superior officer at Plaintiff's location, Publisher Blum, that she needed to take family leave to care for her son due to his medical conditions."  Compl. ¶ 28.  Plaintiff claims The Press never notified her of her rights to take

---

[2] The Parties do not dispute that Defendant is an eligible employer under the FMLA.

leave under the FMLA, nor did they provide her with any individualized written notice pursuant to the FMLA or NJFLA. Compl. ¶¶ 37–38. In addition, Plaintiff describes the animosity of Publisher Blum, who questioned her desire to leave work to aid her son and refused to grant Plaintiff's request for leave related to her son's medical conditions. Compl. ¶¶ 24, 26, 30. She further avers that Blum pressured Celestino to issue a Performance Action Plan ("PAP") and proposed layoffs just thirteen days after learning of Plaintiff's FMLA leave for her foot surgery.

Defendant opposes Plaintiff's claims. First, Defendant highlights the general flexibility that Celestino provided Plaintiff with respect to her son's medical condition. The record clearly shows that on numerous occasions Celestino permitted Plaintiff to come in late or leave early to deal with her son's medical condition. Second, Defendant focuses on the fact that Plaintiff never specifically requested for FMLA or NJFLA leave. She not only had a company handbook that detailed the processes, but she had some familiarity with taking FMLA leave. Third, with respect to the Performance Action Plan, Defendant suggests it took place prior to the meeting where Plaintiff disclosed her son's medical condition to Blum. Defendant also states that the PAP was summarily "thrown out" at the November 17 meeting.

To prevail on a retaliation claim under the FMLA, the plaintiff must prove that: (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights. *See Erdman,* 582 F.3d 500, 508–09 (3d. Cir. 2009) (modifying *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146). Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law.

Under the *McDonnell Douglas* framework, Plaintiff Gill has the initial burden of establishing a prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To do so, she must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of her retaliation claim: (a) invocation of an FMLA right, or notice, (b) termination, and (c) causation. *See Erdman,* 582 F.3d at 508–09; *Conoshenti,* 364 F.3d at 146. If Plaintiff can do so, the burden of production shifts to The Press to "articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas*, 411 U.S. at 802. If The Press meets this minimal burden, she "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [The Press's] articulated legitimate reasons." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### 1. Plaintiff successfully makes a prima facie claim of retaliation

Because Plaintiff suffered an adverse employment decision in her termination, the Court focuses on the first and third prongs of Plaintiff's burden, *i.e.*, whether she satisfied the elements of notice and causation.[3]

### a. Plaintiff satisfies the notice requirement

To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave. 29 U.S.C. § 2612(e)(2). In doing so, the employee "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). The Third Circuit has noted on several occasions that the notice requirement is a liberal and flexible one, not a formalistic or stringent standard. *See Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) (stating that the statutory and regulatory text

---

[3] Evidence in the record does not support any additional argument that Defendant's brief Performance Action Plan (PAP) rises to the level of "adverse employment decision" under the statute. First, Plaintiff does not direct this Court to any caselaw supporting this supposition. Second, Defendant attaches a relevant portion of Plaintiff's deposition where she admits that the PAP was "thrown out" in the November 17, 2016 meeting. Gill Dep'n, 214:6–17.

suggests a "liberal construction" be given to FMLA's notice requirement); *see also Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 474 (8th Cir. 2007) ("The regulations already make it very easy for [an employee] to give notice of her intent to take leave."); *Burnett v. LFW Inc.,* 472 F.3d 471, 478 (7th Cir. 2006) ("The notice requirements of the FMLA are not onerous."). The Court explained in *Lichtenstein*, "the regulations . . . clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 303 (3d Cir. 2012). As such, the central test "is not whether the employee gave every necessary detail to determine if the FMLA applies, but 'how the information conveyed to the employer is reasonably interpreted.'" *Id.* (citing *Sarnowski*, 510 F.3d at 402).

Here, Plaintiff satisfied the notice requirement with respect to both her son's medical condition and her foot surgery. As noted above, the notice requirement represents a liberal standard. 29 C.F.R. 825.303(b) (stating the employee "need not expressly assert rights" under the statute). Relatedly, Courts in this Circuit have rejected Defendant's argument that a Plaintiff must invoke the statute by name or acronym. *See Sarnowski*, 510 F.3d at 402 (emphasizing the text's "liberal construction"). In addition, the record reveals that Celestino was aware of Joshua's medical history as well as Plaintiff's forthcoming foot surgery. While Publisher Blum states that he did not know Joshua's specific condition prior to the November 2015 meeting, the Court is satisfied that Plaintiff provided enough members within The Press of her situation to satisfy the liberal requirement. In addition to her sworn testimony, Plaintiff provides texts and emails that show Defendant's awareness of various procedures and medical concerns. As such, this Court rejects Defendant's argument that Plaintiff needed to specifically request FMLA/NJFLA leave to satisfy the notice requirement.

### b. Plaintiff makes a showing of causation

To demonstrate a prima facie case of causation, the Plaintiff must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir. 2000). When the "temporal proximity" between the protected activity and adverse action is "unduly suggestive," this "is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *Id.* (quoting *Farrell,* 206 F.3d at 280).

Here, the Court finds that Plaintiff made a prima facie showing of causation. First, this Court notes that the law appears to require only an inference of causality for Plaintiff to make a showing of this element. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) (stating that close temporal proximity between two events may give rise to inference of causal connection). The issue is thus whether the temporal proximity of the protected act and the firing is suggestive.

The record clearly supports the Plaintiff's argument. Again, on January 13, 2016, Defendant learned of Plaintiff's foot surgery and need to take at least two weeks leave from work. Just thirteen days after this revelation, Blum emailed Celestino about the elimination of Plaintiff's position. This series of events creates an inference of causality, and thus satisfies Plaintiff's prima facie burden for causation. Accordingly, the Plaintiff has made a prima facie showing, and the burden now shifts to the Defendant under step two of the *McDonnell Douglas* test.

## 2. Defendant establishes a legitimate, non-retaliatory reason for the adverse action

Now, the Defendant must articulate a legitimate, nondiscriminatory reason for the adverse action. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997). The burden then shifts back to the plaintiff, who must show that the employer's proffered explanation was pretext and that the employer's real reason for retaliating against her was because she took FMLA-protected leave. *Hodgens*, 144 F.3d at 161; *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 532 (D.N.J. 2008).

The Press's business interest and reduction in force are legitimate, non-retaliatory reasons for the adverse action. Several facts in the record support this position. First, The Press was desperate to lower costs and the reduction appears to be consistent with that goal. In addition, the elimination of Plaintiff's position coincided with an ongoing plan to outsource the Circulation Department's duties to Tulsa, Oklahoma. The Company also installed new circulation software to further reduce work in the Circulation Department. Second, Defendant's emails on the record, which specifically discuss Plaintiff's future employment, do not make any mention of the medical needs of either her or her son. In fact, the January 26, 2016 email between Blum and Celestino discusses the positions of several employees and the proposed consolidation. The only mention of Plaintiff is related to the elimination of her *position* and the corresponding savings of $30,000. Finally, Publisher Blum testified at length that the reduction in force was an ongoing process that focused on cost savings; it involved the heads of various departments and direction from the corporate office. Satisfied that the Defendant has established a legitimate, non-retaliatory reason, the Court turns to step three of the *McDonnell Douglas* test, where the burden again shifts to the Plaintiff.

### 3. Plaintiff fails to show the reduction in force was a pretext for retaliation

To survive summary judgment when the employer has articulated a legitimate nondiscriminatory reason for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To discredit the employer's articulated reason, Gill need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, *Sempier v. Johnson & Higgins,* 45 F.3d 724, 732 (3d Cir. 1995), nor produce additional evidence beyond her prima facie case, *Fuentes*, 32 F.3d at 764. She must, however, point to "weaknesses, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. *Id.* at 764–65 (quoting *Ezold*, 983 F.2d 509, 531 (3d Cir. 1992)).

### a. Plaintiff fails the first pretextual test

Here, a factfinder could not reasonably disbelieve The Press's articulated, legitimate purpose in the reduction in force plan. The Press's financial difficulties are well documented. In addition, evidence on the record directly ties the elimination of Plaintiff's position with a cost savings of $30,000. Plaintiff appears to counter this evidence by suggesting The Press's efforts are somehow attenuated from the elimination of her position. Specifically, Plaintiff alleges that the new software and outsourcing plans predated the reduction in force by more than a full year.

Unpacking this logic, Plaintiff seems to argue that her reduction should have come sooner, and therefore the Court should not believe the articulated purpose of reducing costs.

The Court disagrees with Plaintiff's efforts to doubt The Press's articulated business purpose. If anything, Plaintiff only provides scant evidence that the plan *could* have been executed in a *more effective* way. Courts have long rejected this kind of argument that hinges on business efficiency. As explained in *Keller*, "the question is not whether the employer made the best, or even a sound, business decision; it is whether the *real* reason is [discrimination]." *Keller*, 130 F.3d at 1109 (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)) (alteration in original).

Plaintiff also challenges Defendant's evidence in this prong. Plaintiff appears to suggest that Defendant's evidence does not wholly support a legitimate business decision. Specifically, Plaintiff states that the January 2016 email reveals an animus because it does not show *all* of the reasons for the termination of the Circulation Sales Manager position. The Plaintiff's argument appears to go as follows: if Publisher Blum and Director Celestino did not discuss the outsourcing plan and new software in their private email, this Court cannot trust the stated business purpose because it is incomplete.

This argument is similarly unavailing. Not only does Plaintiff provide no caselaw, but the argument is absurd when taken to its logical conclusion: supervisors and business managers would simply rubber stamp business decisions with exhaustive justifications to shield themselves from potential liability. Again, as explained above, the January 2016 email that Plaintiff relies on appears to be an evenhanded discussion of how to lower business costs. Despite Plaintiff's focus on The Press's animus in another case, the email here is not attempting to superficially employ Plaintiff only to fire her upon return from leave. *See O'Donnell v. BH Media Group,*

*Inc.*, No. 16-5192, 2018 WL 2357744 (D.N.J. May 24, 2018). Instead, the decision to terminate Plaintiff appears wholly consistent with the substantial planning and investment behind various initiatives to lower costs.

Plaintiff next argues that Defendant's termination of her position is a sham because The Press replaced her with another employee who assumed the same responsibilities just under new title. She alleges that the new employee, Ms. Hammond, had "the same duties." But Plaintiff has not provided evidence to support her argument. *See Lepore v. Lanvision Sys., Inc.*, 113 F. App'x. 449, 453 (3d Cir. 2004) (explaining that a Plaintiff must proffer evidence to show a reduction in force is an illegitimate pretext). Ms. Hammond's salary and role are not squarely presented alongside Plaintiff's. In addition, even if the Defendant *did* replace Plaintiff with Ms. Hammond, she has not met her burden and adduced evidence to undercut The Press's stated business goal of lowering costs in the Circulation Department. In other words, there appears to be no evidence that the new employee is as costly as Plaintiff. And, even if Hammond's pay is the same as Gill's, which does not appear in the record, Plaintiff does not show how Hammond is less cost-effective. The Court is therefore satisfied that Plaintiff Gill fails the first pretextual test.

### b. Plaintiff fails the second pretextual test

To survive the second pretext test, "a plaintiff must point to evidence with sufficient probative force that would allow a fact finder to conclude by a preponderance of the evidence that engaging in the protected activity was a motivating or determinative factor in the employment action." *Paul v. UPMC Health Sys.*, No. 06–1565, 2009 WL 699943 at *19 (W.D.Pa. Mar. 10, 2009). Specifically, relevant evidence that should be examined under the test includes:

> (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people who engaged in the same protected activity as plaintiff or has discriminated against other people within another protected class or (3) whether the employer has treated more favorably similarly situated persons who did not engage in plaintiff's protected activity.

*Id.* The Court now considers the evidence Plaintiff has adduced to show she was pretextually terminated.

First, Plaintiff describes the same temporal proximity of the prima facie showing for causation above to loosely argue that discrimination was "a motivating factor." In doing so, Plaintiff here confuses the requirements on one side of the *McDonnell Douglas* test with the burden shifting pretextual showing on the other. *See Truesdell v. Source One Personnel, Inc.*, 2009 WL 1652269, at *8 (D.N.J. 2009) ("While . . . temporal proximity can be sufficient to establish a prima facie case, it alone is not sufficient to rebut Defendant's proffered reasons for, or show that discrimination was more likely than not, a motivating or determinative cause of, the adverse employment action."). As such, rather than adduce evidence that reveals an animus, Plaintiff repeats the temporal proximity arguments made under the causation prong above.[4] This kind of argument does not satisfy the burden of showing a pretext.

Next, Plaintiff argues that Defendant had previously discriminated against the Plaintiff and therefore pretextually terminated her. Plaintiff focuses on Director Celestino and Publisher Blum, the PAP issuance, and the November 17, 2015 meeting. Specifically, Celestino testified

---

[4] While there is no bright line rule as to what constitutes "unduly suggestive" temporal proximity, Courts have rejected three-to-five-month gaps between the protected activity and the adverse action, without more, to defeat summary judgment. *See Clark County School Dist.* 532 U.S. at 273 (citing favorably *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997), which rejected such an inference where the events were three months apart); see also *Andreoli v. Gates,* 482 F.3d 641, 650 (3d Cir. 2007) (explaining that a five-month time period between employee's complaint and first adverse action was, without additional evidence, insufficient to raise an inference of causation).

that he felt "pressure" to address Plaintiff's frequent late arrivals during the period of her son's 2015 medical problems. Celestino also attributed the PAP issuance to Publisher Blum's pressuring him. Publisher Blum allegedly verbally denied Plaintiff's request for permanent leave to work from home. And finally, Celestino noted that the first time he heard of Plaintiff's name with respect to the contingency list was when Blum suggested it by email. Celestino Dep'n 153. Celestino later noted, "I thought it was a bad idea because she's my right arm and I didn't know what I would do without her, honestly." Celestino Dep'n 153:15–22. The Court considers these circumstances in turn.

This Court finds that the PAP issuance is not probative of a pretextual showing under this test. Most obviously, PAP is not *per se* evidence of discrimination. *See Hair v. Fayette County of Pennsylvania*, 265 F. Supp. 3d 544 (W.D. Pa. 2017) (explaining that a written reprimand placed in county employee's personnel file did not constitute adverse employment action, and thus county did not retaliate against employee for protected activity under FMLA). Second, PAP appears to have had, *at most*, a brief and inconsequential impact on Plaintiff. For example, Plaintiff admits that the PAP was "thrown out" at the November 17, 2015 meeting. In addition, the Court struggles to connect the short and general mention of "hours" within the PAP memo specifically to Plaintiff's son's medical condition. In fact, most of the document discusses productivity and collegiality; the general mention of "hours" is a mere three lines.

This Court similarly finds that Blum's alleged statements in the November 2015 meeting to be unrelated from the ultimate decision to terminate Plaintiff's position. Plaintiff claims she requested to work from home on an intermittent basis to care for her son. Pl. SMOF ⁋ 30. In the meeting, Plaintiff claims that Publisher Blum said,

> [W]e do not make special accommodations at your level. There's no other employees inside this company that we currently have that we accommodate for. You are a manager and you manage other employees . . . you have vacation time and you have sick time.

Pl. Reply SMOF ‖ 44.

Even when viewed in a light most favorable to Plaintiff, Plaintiff's focus on Blum's comments, without more, do not establish a pretext. First, the record indicates that Plaintiff continued to take intermittent leave following this meeting. Second, Plaintiff does not indicate how these comments were related to the decision to terminate her. *See Edwards v. Pennsylvania Turnpike Com'n*, 80 F. App'x 261, 264 (3d Cir. 2003) (finding remarks made by supervisors unrelated to the decision to terminate a plaintiff were "stray remarks" and not to be given great weight). Third, Plaintiff fails to instruct the Court to the <u>injury</u> she suffered as a result of the Blum's alleged denial of her request to work from home. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (explaining that the FMLA "provides no relief unless the employee has been prejudiced by the violation").

Plaintiff next argues that The Press's alleged failure to notify her of her FMLA rights is *per se* evidence that she was retaliated against. Again, Plaintiff appears to conflate statutory regulations that require qualifying employers to provide notice of FMLA rights with a plaintiff's burden to make a pretextual showing in claiming FMLA retaliation. *See Ragsdale*, 535 U.S. at 82 ("In contrast, § 825.700(a) enforces the individualized notice requirement in a way that contradicts and undermines the FMLA's pre-existing remedial scheme.") Relatedly, Courts have rejected this kind of strict liability argument in a retaliation claims. *See Hawkins v. Ctr. for Spinal Surgery*, 34 F. Supp. 3d 822 (M.D. Tenn. 2014) (explaining the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation). As such, this

Court finds The Press's alleged failure to satisfy FMLA notice insufficient, without more, to make a retaliation claim.

The Court next considers Plaintiff's notice argument in context to her foot injury. Plaintiff argues that Defendant's misclassification of her FMLA rights, offering her six weeks of disability leave, is evidence of a discriminatory intent. Again, Plaintiff does not appear to argue that she lost compensation or medical benefits. She does not make any argument as to *how* information of FMLA leave would have assisted her during the 2016 surgery. *See Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 22 Wage & Hour Cas. 2d (BNA) 790 (1st Cir. 2014) (denying Plaintiff's FMLA claim because he provided no evidence to support his allegation that he could have done things differently if he had known that his leave would count toward his FMLA entitlement). This Court relatedly finds that Plaintiff's argument fails to establish Defendant's pretextual termination. *See also Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 24 Wage & Hour Cas. 2d (BNA) 1470 (8th Cir. 2015) (finding no FMLA violation when the employer's misclassification of leave as non-FMLA leave did not alter the leave's duration or the employee's compensation).

Finally, the Court notes that Plaintiff misconstrues the Third Circuit's discussion of evidence under the test for a pretextual showing. In *Fuentes*, the Court explained that in order to survive summary judgment, a plaintiff must present sufficient evidence "to meaningfully throw into question, *i.e.*, to cast substantial doubt upon," an employer's proffered reasons for the termination. The Court explained, that a Plaintiff must paint the decision as "weak, implausible, contradictory, or incoherent." For example, an employee could show the employer treated similarly situated persons outside of plaintiff's protected class more favorably, or the employer similarly mistreated other members of plaintiff's protected class. Plaintiff Gill, however,

provides no evidence that similarly situated employees seeking FMLA leave were denied such leave or another group was treated more favorably.

Because no reasonable trier of fact could conclude from the record that Defendant fired Plaintiff for taking FMLA leave, the Court will grant summary judgment in favor of Defendant on the claims of retaliation. The Court now turns to the interference claims.

## B. Plaintiff's interference claims fail (Counts II and III)

29 U.S.C. § 2615(a)(1) of the FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" that it guarantees. "Interference" includes "[a]ny violations of the [FMLA] or of these [FMLA] regulations." 29 C.F.R. § 825.220(b). An interference claim under § 2615(a)(1) is "not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Philadelphia*, 430 F.3d 117, 120 (3d Cir. 2005). To prevail on an FMLA interference claim, an employee need only show that (1) she was entitled to benefits under the FMLA; and (2) she was denied them. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 312 (3d Cir. 2012); *Sommer v. The Vanguard Group,* 461 F.3d 397, 399 (3d Cir. 2006).

Here, the factual circumstances surrounding Plaintiff's interference claim is analogous to the retaliation claims above. The Court notes that many federal courts of appeals have affirmed dismissal of interference claims that—although not necessarily analogous to Gill's claim here—were duplicative of the plaintiff's retaliation claims. *See e.g.*, *Lovland*, 674 F.3d at 811–12; *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 282–83 (6th Cir. 2012); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006); *see also Atchison v. Sears*, 666

F.Supp.2d 477, 489 (E.D.Pa. 2009) ("[Plaintiff's] interference claim is identical to his retaliation

claim, and premised on the same allegation . . . . He cannot escape the *McDonnell*

*Douglas* analysis to prove his case merely by affixing an 'interference' label to one of

his duplicative claims.").

Even if this Court entertains what appears to be a duplicative claim, the Defendant has

demonstrated that Plaintiff's termination was a legitimate business decision, unrelated to

Plaintiff's exercise of FMLA rights. *See Lichtenstein*, 691 F.3d at 312 (stating that employer

may defeat employee's claim of interference "if it can demonstrate that [the employee] was

terminated for reasons 'unrelated to' her exercise of [FMLA] rights" (quoting *Sarnowski v. Air*

*Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007))); *Conoshenti*, 364 F.3d at 141 (noting

that there is no right to reinstatement under the FMLA if the adverse employment decision

occurs for a reason unrelated to the leave); *see also Kumar v. Johnson & Johnson, Inc*., No. 12-

779, 2014 WL 5512549, *11 n.8 (granting summary judgment in defendant's favor as to

plaintiff's interference claim where her "only claim of 'interference' under the FMLA is the

same as her claim for retaliation– 'not being returned to the same job with the same opportunities

for advancement'").

Finally, to the extent Plaintiff also claims that she was discouraged from taking FMLA

leave, the Court finds that there is insufficient evidence on the record. While some of Blum's

actions could be considered to be discouragement by a reasonable juror, *see Hilborn v.*

*Cordaro,* Civ. No. 06–223, 2007 WL 2903453, at *7 (M.D. Pa. Sept. 28, 2007) (noting that

discouragement could include pressuring the employee to take leave at another time)

(citing cases), there is no indication that Plaintiff was *prejudiced* by any of Publisher Blum's

behavior. *See Wright*, 2013 WL 6080072, at *10 (finding that, while a jury could reasonably

infer that the defendants discouraged the plaintiff from requesting intermittent FMLA leave, Plaintiff had failed to produce any evidence of prejudice because she had failed to show that she would have been entitled to additional leave that she did not obtain due to the defendants' discouragement); s*ee also Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 143 (3d Cir. 2004) (finding that an employee would only be able to prove FMLA interference if he established that the employer's actions rendered "him unable to exercise that right in a meaningful way, thereby *causing injury*") (emphasis added).

As such, this claim fails on the merits and, as already discussed above, no reasonable juror could find that Defendant's decision was pretextual.

## C. The Court declines to exercise supplemental jurisdiction over the additional state law claims

The Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).

Plaintiff's only claims under federal law have been dismissed, and there is no affirmative justification for this Court to retain supplemental jurisdiction over the state law claims this early in the litigation. As such, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). The remaining Counts are therefore dismissed without prejudice.

## IV. CONCLUSION

For the reasons discussed above, this Court **GRANTS** Defendant's Motion for Summary

Judgment.  A corresponding Order will follow.


Dated:   2/13/2019                                                    s/ Robert B. Kugler
                                                                            ROBERT B. KUGLER
                                                                            United States District Judge